## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GRAHAM B.C. ROMAN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 23-4032-KSM** |
| | : | |
| **COUNTY OF CHESTER,** *et al.*, | : | |
| **Defendants.** | : | |

## MEMORANDUM

**MARSTON, J.**                                                                **May 13, 2024**

Pro se Plaintiff Graham B.C. Roman, an inmate currently confined at Chester County Prison ("CCP"), commenced this civil action alleging violations of his constitutional rights, as well as his rights under Title II of the Americans with Disabilities Act of 1990 ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").  (*See* Doc. Nos. 2, 19.)  Currently before the Court are:  (1) the Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants County of Chester, County Commissioner Josh Maxwell, former CCP Warden Ronald Phillips, Acting Warden Howard Holland, Deputy Warden George Roberts, Major Morgan Taylor, Sergeant Mark DiOrio, Corporal Sundifu Dorley, and Correctional Officer Komla Amouzou, (collectively, the "County Defendants") (Doc. No. 51); (2) the Motion to Dismiss Plaintiff's Complaint filed by Defendants PrimeCare Medical, Inc. and Karen Murphy, RN (collectively, the "Medical Defendants") (Doc. No. 52); and (3) Roman's response in opposition to both motions (Doc. No. 59[1]).

## I.      BACKGROUND

Roman has been incarcerated at CCP since he turned himself in on multiple charges for

---

[1] A duplicate copy of Roman's opposition brief is docketed at Doc. No. 60.

child sex offenses.  *See Commonwealth v. Roman*, Nos. CP-15-CR-0003288-2021, CP-15-CR-003306-2021 (Chester Cnty. Ct. Comm. Pl.).[2]  Throughout his time at CCP, Roman has filed numerous complaints about his treatment and the treatment of his fellow prisoners.  (*See, e.g.*, Doc. No. 2 at 12, 14, 20, 21; Doc. No. 2-1.)  Roman's concerns about his own treatment culminated in litigation, when on April 27, 2023, Roman filed a complaint against the County, PrimeCare, Aramark Correctional Services, LLC (the prison's food services provider), and certain of their employees.  *See Roman v. County of Chester*, Civil Action No. 23-1662 (the "April Action").  In the April Action, which remains pending, Roman argued that the defendants violated his constitutional rights by denying him access to necessary dental care, refusing to provide him with his prescribed medical diet, moving him from cell to cell for no penological purpose, and sexually harassing him.  *See id.* at Doc. No. 17 (initial complaint), Doc. No. 30 (supplemental complaint, filed June 2023).  Although there is some overlap in the allegations asserted in the April Action and in this case, the claims are, for the most part, distinct.

Five months later, in October 2023, Roman filed the instant action.  (*See* Doc. No. 2 (initial Complaint, which lists September 29 as the date it was signed, but discusses facts after this date and is postmarked October 17, 2023).)  On November 5, 2023, after the Court directed service of Roman's initial Complaint (*see* Doc. No. 5), Roman filed a motion to enter a supplemental complaint pursuant to Federal Rule of Civil Procedure 15(d) (*see* Doc. No. 19).  The Court granted the motion, construing Roman's filings at Doc. Nos. 2 and 19 to comprise the operative Complaint, and directed service of the Complaint on all named Defendants.  (Doc. No. 20.)  Roman's Complaint in this action is rambling and somewhat difficult to follow, but

---

[2] In December 2023, a jury found Roman guilty on many of the charges in Case No. CP-15-CR-003306-2021, and in April 2024, he was sentenced to between 10.5 and 21 years' incarceration.  *See Commonwealth v. Roman*, CP-15-CR-003306-2021, Criminal Docket (Chester Cnty. Ct. Comm. Pl.).

Roman's main claim seems to be that since filing the April Action, he has been denied access to necessary medical care and subjected to retaliation for reporting perceived issues at CCP. (*See generally* Doc. Nos. 2, 19.) The Court outlines the allegations related to medical care before turning to those for retaliation.

### A.       Denial of Medical Care

Roman represents that he is a mentally ill, "D-Rate" inmate, and that he suffers from opioid use disorder, chronic pain disorder, and osteogenesis imperfecta (i.e., "brittle bone disease"). (Doc. No. 2 at 20.) Roman broadly claims that he was refused medical care for these conditions, that care was delayed, and that he was unable to attend scheduled medical appointments due to a lack of security escorts. (*Id.* at 16, 21, 26, 36.) He also raises multiple claims specific to his treatment needs for each condition.

### 1.       <u>Mental Health Conditions</u>

Roman, who is 34 years old, indicates that he has a long-standing history of mental health struggles which began no later than 1997, and that he has been diagnosed Bipolar, Type 1 suffering from ongoing manic episodes, severe paranoia, and anxiety. (Doc. No. 19 at 4.) He has received mental health treatment through Chester County Human Services "his entire adult life" and was assigned a D-Stability[3] rating when incarcerated at SCI Chester in 2016 on unrelated charges. (*Id.*)

Despite his diagnosis, Roman claims that CCP employees frequently cancel his mental health appointments. According to Roman, "non-medical" employees at CCP often "interfere with his access to [mental health] treatment . . . for non-penological or medical reasons," such

---

[3] This term is not defined in the Complaint nor has the Court's independent research identified what this term means.

that he has missed over 20 mental health visits "due to non-medical reasons," including a lack of security escorts.  (Doc. No. 2 at 20; Doc. No. 19 at 13.)  Roman asserts that his mental health is declining, but Defendants continue to refuse to provide escorts to mental health appointments.  (*Id.*)

Roman also claims that CCP has incorrectly housed him on R-Block instead of M-Block with the other inmates who need a higher level of mental health treatment.  He notes that on October 20, 2023, he was seen by a PrimeCare psychologist who informed Roman that as a D-Rate inmate, Roman should have been housed on M-Block.  (Doc. No. 19 at 13.)  When the psychologist told "security" that he should be moved to M-Block, "a non-medical officer named [Corporal] Neivez told the doctor and others [that], [']no [Roman] is faking it, we won't move him.[']"  (*Id.*)

Roman claims that the custom of non-medical corrections officers overruling medical and mental health staff determinations has a negative impact on his health.  (*Id.*)  He asserts that he is forced to seek help in any way that he can, but suffers retaliation for doing so.  (*Id.*)

## 2. Opioid Use Disorder

After a car accident on February 11, 2020, Roman states that he became "heavily involved in opioids," and from 2020 to 2021, he received treatment for opioid use disorder at Mirmont Outpatient Center in Exton, Pennsylvania.  (Doc. No. 2 at 16, 34.)  Despite receiving treatment in the past, Roman continues to experience intense cravings, and given the availability of illicit drugs in and outside of CCP,[4] he remains "in fear of . . . relapse and overdose."  (*Id.* at 34.)

---

[4] Roman claims that a CCP correctional officer was fired in October 2023 for bringing drugs into CCP.  (Doc. No. 2 at 26.)

Roman claims that he has made numerous requests to receive treatment for opioid use disorder at CCP, but each time was refused access to CCP's Medication-Assisted Treatment ("MAT") program.  (*Id.* at 15–17.)  MAT programs use medications, such as buprenorphine, methadone, and naltrexone, in combination with counseling and behavioral therapies, to treat opioid use disorder, and they have been known to help some people sustain recovery.  *See Information about Medication-Assisted Treatment (MAT)*, U.S. Food & Drug Administration, https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat (last visited April 11, 2024).  Roman contends that the County and PrimeCare "refused and ignored sick calls, request slips and grievances over plaintiff's consistent attempts to receive . . .  [MAT] for opioid use" because the County and PrimeCare have a custom or policy of only providing MAT to individuals with substance use disorder for opioid dependency "in the form of (continuation), 'NOT' in the requested or required (Induction) that other facilities follow as is the 'standard' clinically."  (*Id.* at 33.)  By "continuation," the Court understands Roman to mean that inmates who are actively participating in MAT when they enter CCP are allowed to continue their MAT treatment plan.  By contrast, inmates who wish to start MAT (i.e., "induction") are not allowed to participate in the MAT program while at CCP.

In addition, Roman alleges that PrimeCare and CCP personnel refuse to request and review Roman's medical records related to his pre-incarceration treatment for opioid use disorder, which he believes would show that he should be in the MAT program while at CCP. (*Id.* at 16, 25.)  He asserts that in doing so, Defendants have denied him the benefit of a health service because of his disability.  (*Id.*)

### 3.   Osteogenesis Imperfecta

Next, Roman alleges that he has been denied necessary care for his bone disorder, osteogenesis imperfecta.  Osteogenesis imperfecta is more commonly known as brittle bone

disease.  *See* https://www.niams.nih.gov/health-topics/osteogenesis-imperfecta (last visited Apr.

23, 2024).  It is an inherited disorder characterized by fragile bones that break easily.  *Id.*  Roman

alleges that he has had 27 fractures and gone through 8 surgeries in his life because of this

disorder (Doc. No. 2 at 20), including a fractured arm resulting from a fall off of a top bunk in

2012 (Doc. No. 59 at 9).  Because of this disorder, Roman has had "bottom bunk status" almost

the entire time he has been incarcerated at CCP.  (Doc. No. 2 at 35.)

Roman claims that multiple County Defendants have, against medical recommendation,

refused to consistently provide Roman with a bottom bunk.  (Doc. No. 2 at 34, 40.)  He notes

that he spoke with a nurse on September 2, 2023 who had been unaware of his bottom bunk

status.  (*Id.* at 35.)  When the nurse contacted Defendant Sergeant DiOrio to inform him of

Roman's medical need, Sergeant DiOrio instructed Roman to place his mattress on the floor,

rather than use the top bunk.  (*Id.*)  Sleeping on the mattress on the concrete floor causes severe

pain to Roman's back and knees.  (*Id.* at 35, 40.)

### 4.    Chronic Pain Disorder

Last, Roman argues that he is being denied necessary medical care for his chronic pain

disorder, which arose as a result of Roman's osteogenesis imperfecta.  (*Id.* at 24–25.)

Specifically, Roman alleges that he is required to use pain medication long term to manage this

disorder, but the prison refuses to give him any pain medication besides ibuprofen and

acetaminophen, which he claims cause acute irritation to his stomach.  (*Id.* at 25.)

### B.    Retaliation

In addition to his allegations surrounding medical care, Roman contends that Defendants

retaliated against him for filing grievances, for pursuing the April Action and this litigation, and

for assisting other inmates with their own civil rights complaints.[5]  (*Id.* at 19, 38; Doc. No. 19 at 5.)  According to Roman, as he fought to protect his own rights and the rights of others, he became subject to an ongoing campaign of harassment and retaliation, with Defendants labeling him "Medical Level 1" in June 2022, even though he did not have suicidal ideation, and moving him from cell to cell in February 2023 for no penological reason.  (Doc. No. 2 at 38.)[6]

Roman contends that in the months since then, Defendants have become more open about their dislike of his use of CCP's grievance system and civil litigation, such that some correctional officers have warned inmates to stay away from Roman "if they know what's good for them." (Doc. No. 19 at 8.)  Likewise, they have warned other officers to stay away from Roman, and to be careful so that Roman does not file a grievance against them or sue them.  (*Id.* at 8–9.) Indeed, when Roman reported to Sergeant DiOrio that he had been refused access to medical care, Sergeant DiOrio responded, "I don't care.  I'm not getting involved with you."  (Doc. No. 2 at 40.)

Other prison officials have similarly refused to respond to Roman's complaints, even when those complaints are filed by external agencies.  On September 8, 2023, Roman met with Rebecca Johnson of the Pennsylvania Prison Society to discuss the April Action and his allegations of being refused medical care and retaliation.  (Doc. No. 19 at 7, 21.)  He met with her again on September 12, 2023, and also with Alexandria Hermann from Disability Rights Pennsylvania, to "formally file complaints" against CCP.  (Doc. No. 2 at 21–22.)  In response to

---

[5] Roman claims that it is "well-established" within CCP that he will help any inmate "who has suffered at the hands of the County of Chester."  (Doc. No. 19 at 8.)

[6] These allegations overlap with the allegations raised by Roman in the April Action.  *Compare* Doc. No. 2 at 38 (alleging that in February 2023 Plaintiff was "moved from cell to cell with no penological advancement in sight"), *with* April Action, Doc. No. 17 at 18–19 (alleging that as of February 2023, Plaintiff "had been moved (18) times in under (17) months," including five times in a 24 hour period, and that "a great number of these moves had no penological re[a]sons or security based reasons").

these complaints, Defendant Major Taylor "informed all correctional officers, [Roman's] counselor Williams, and [the] Pennsylvania Prison Society [that] [CCP] will not respond, nor will [the prison] act [on Roman's complaints] due to [his] civil action 1983 use." (*Id.*)  Roman alleges that Major Taylor has also "been forcing all other defendants, correctional officers, counselors, and staff to limit all acts, responses, and involvement" with Roman, along with limiting his "access to legal call[s] for . . . [the April Action]." (*Id.* at 23.)

Roman asserts that Defendants' retaliatory acts increased after his meetings with Ms. Johnson and Ms. Hermann, culminating in two disciplinary citations in October 2023, both of which were upheld by the prison's disciplinary board. (*Id.*; Doc. No. 19 at 7, 9.)

### 1.      First Citation (No. 23-1019-157)

First, Roman claims that on October 10, October 14, and October 16, 2023, he filed inmate request slips in person to non-defendant Captain David Ham and filed a grievance form with Defendants Deputy Warden Roberts and Major Taylor.  In those forms, Roman claimed that he was being harassed by Defendants Corporal Dorley and Officer Amouzou because he was helping his fellow inmates and coworkers on Quad 1 file civil rights claims. (Doc. No. 19 at 9–10.)  On October 17, Roman spoke with Captain Ham in person about these claims. (*Id.* at 10.)

A few days later, on October 19, Roman learned that other inmates had been told that they were no longer permitted to eat "at the carts or sit in Quad 1." (*Id.*)  Although Roman lived on Quad 2, he worked on Quad 1, and previously, he and the other workers had been permitted to eat on Quad 1.  When Roman discussed the change with Officer Amouzou, the officer screamed at Roman from behind a window and told him to "stop telling on them and he will leave [Roman] alone." (*Id.*)  After this encounter, Roman grew manic and could not calm down. (*Id.* at 10–11.)  He went to the door at the entrance of Quad 2 to ask Corporal Dorley whether a nondefendant identified as Corporal Lesh was on duty. (*Id.* at 11 (explaining that Corporal Lesh

treated Roman fairly during previous panic attacks).)  When Corporal Dorley responded that he was not, Roman asked why Officer Amouzu was permitted to behave the way he did.  Corporal Dorley turned to leave and said, "stop telling on us.  Then it will go away and shit will stop." (*Id.*)

At that response, Roman became even more upset and paranoid. (*Id.* at 11–12.)  Corporal Dorley responded by approaching Roman in a close, aggressive manner and "threatening" Roman.  (*Id.*)  When Roman replied that he would file a grievance against Corporal Dorley for the threats, Corporal Dorley stepped even closer to Roman, told Roman that he was fired from his prison job, and instructed Roman to "lock in."[7]  (*Id.* at 12.)  Roman grabbed the door to enter Quad 2, but it was locked, so he shook it and yelled for the door to be opened.  (*Id.*)  Corporal Dorley continued to threaten Roman, telling him, "now [you] will be hungry . . . .  [You'll] have no job and the county will pay for [my] attorney to fight [you] in court."  (*Id.*)  Corporal Dorley also said that he could "write [Roman] up for anything he feels like and it will stick."  (*Id.*)

Roman eventually returned to his cell, where nondefendant Officer Joshua Strickland told him that Defendants Sergeant DiOrio and Corporal Dorley had issued a citation against Roman and that he needed to pack his belongings because he had to move to the restricted housing unit ("RHU") in Quad 3.  (*Id.* at 12–13.)  The relevant citation—numbered 23-1019-157—cites Roman for disrespecting staff, refusing to lock in, disobeying a direct order, and refusing a cell transfer.  (*Id.* at 25.)  It lists the relevant facts as:

> On the above date, I [Officer] Strickland (#957) was assigned to R-Block when the following incident occurred.  Inmate (IM) Roman, Graham (#55599) who at the time of incident, was a current R-Block tier worker, IM Roman became irate after he was directed by a block officer to eat chow in the quad he is assigned to (Quad R2).  IM Roman stated that he was given permission by a Captain to eat in

---

[7] From context, the phrase "lock in" appears to mean that the prisoner should return to their cell.

the sally-port area; or Quad R1 if the 4-12 shift officers do proper job duties[. He then] made threats of legal action as a form of intimidation.

At approximately 1705 IM Roman approached a supervisor who was on R-Block for an unrelated matter.  IM Roman engaged in an aggressive conversation where it was explained to him that he is to only eat in the quad that he is assigned to.  IM Roman remained argumentive [sic], and continued to aggressively make threats of legal action, while referencing his correspondence with the Prison Society.

IM Roman was ultimately directed to return to his assigned cell, which he initially refused, and continued to argue.  IM Roman was directed to return to his cell approximately 5 times before compliance was gained.

Once IM Roman was escorted back to his cell, block officers were notified that IM Roman is going to be cited for disrespecting staff and disobeying a direct order, and relieved of his tier-worker duties.

Upon notifying IM Roman that he was to pack up his belongings to transfer to another cell; IM Roman stated that I [Officer Strickland] will need to contact a supervisor claiming that he is not moving without one.

Section 8 supervisor was then notified, and due to IM Roman's erratic behavior, a group of officers arrived on R-Block to move him to R-63 cell.

IM Roman transferred cells without further incident, and is now a Level 5R, Pending Boards.

(*Id.*)  Roman claims that during this time, he was warned to stop filing grievances and was told

that if he would only "lay low" he could get his job back 30 days after being released from the

RHU.  (*Id.* at 19.)

## 2.   <u>Section Citation (No. 23-1023-187)</u>

A few days after receiving the first citation, Roman made a cardboard sign that said,

"October 23, 2023 ADMINISTRATION WHY DID YOU LET CPL. DORLEY AND

AMOUZOU THREATEN ME AND DO THIS TO ME I HAVE WITNESSES HELP ME

PLEASE I'M A D-RATE."  (*Id.* at 14.)  Roman entered the yard with the sign and held it aloft

over his head for approximately 20 minutes before he was removed from the yard and sent to his cell. (*Id.*) Roman claims that he held the sign because he was fearful and felt that prison administration did not protect him. (*Id.*) For this incident, Captain Dorley issued a second citation, numbered 23-1023-187. (*Id.* at 15; 26.) The facts listed in the citation are largely in line with those given by Roman. (*Compare id.* at 15, *with id.* at 26.) As a result of the citation, Roman was given an additional 21 days in RHU and his "personal properties were taken from him. He was [also] taken to medical to be seen by psych due to his status as a D-Rater, [and] he was placed on a 7-day psych log by Dr. Murphy." (*Id.* at 26.)

### 3.     <u>Ongoing Harassment</u>

While Roman awaited a disciplinary hearing on the two citations, the harassment continued. On October 24, 2023, Roman was escorted to medical for x-rays of his lower back. (*Id.* at 16.) He claims that Corporal Dorley yelled at him from central control and that this "has become habit" for Defendants Sergeant DiOrio and Corporal Dorley, who are trying to coerce Roman to cease his legal actions. (*Id.* at 15–16.) Roman claims that they told him, "if [he will] let it go[,] they will, and [that his] fight is not in prison[,] it[']s in [his] criminal case." (*Id.* at 16.) On October 25, 2023, Corporal Dorley again yelled at Roman and a nondefendant identified as Roman's counselor, telling the counselor to "stay away from this snitch." (*Id.*)

The next day, Officer Amouzu told Roman's former coworkers in Quad 1 that they could return to eating on the quad now that Roman had been fired from his job. (*Id.*) That same day, Roman grew upset while reporting Sergeant DiOrio and Corporal Dorley's conduct to prison leadership. While Roman was being escorted back to his cell, Sergeant DiOrio, who was at central control, made crying sounds, called Roman a baby, and said "keep telling on [me and] see what happens, [I am] not scared of [you]." (*Id.*) Later, during cell searches, Sergeant DiOrio again told Roman that he was a "bitch," and that Roman did not scare him. (*Id.*) In the presence

of another officer, Sergeant DiOrio then began repeatedly singing, "you're a bitch" at Roman. (*Id.*)

### 4.    **Disciplinary Hearing**

On October 30, 2023, CCP held a disciplinary hearing for citation No. 23-1019-157, which related to Roman's failure to "lock in" when asked, and for citation No. 23-1023-187, which related to Roman holding the sign in the yard.  (*Id.* at 24.)  The prison's disciplinary board upheld both citations and Roman was disciplined in a variety of ways, losing good time earned, his prison job, a television that he purchased in the commissary, other commissary items, and phone access.  (*Id.*)

Roman claims that the hearing was unconstitutional and that Defendants violated prison disciplinary procedures to hide their acts of retaliation and harassment.  Specifically, he argues that the citations were "false," and that the disciplinary board wrongly refused to provide written statements by the fact finders as to the evidence relied upon and the reasons for the disciplinary action that was taken.  (*Id.* at 18.)  Roman also claims he was not permitted to call witnesses during the proceedings.  (*Id.* at 19.)

## II.    STANDARD OF REVIEW

As noted above, County Defendants and Medical Defendants have moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).  (*See* Doc. Nos. 51, 52.)  "A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id*. (citing *Bell Atl. Corp.*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). It is the defendants' burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). To determine whether a complaint filed by a *pro se* litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally).

Additionally, because Roman is proceeding *in forma pauperis*, the Court may independently screen his Complaint and dismiss a claim "at any time" pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) if, among other things, it fails to state a claim. *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim."). The standard under this screening provision is the same standard set forth above that governs a

dismissal under Rule 12(b)(6).  *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

## III.    DISCUSSION

As noted above, Roman's *pro se* Complaint is lengthy and somewhat rambling.

Although a complaint may not be amended by a plaintiff's brief in opposition to a motion to

dismiss, *see Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)

(quotation omitted); *Ernst v. Union Cnty. Conservation Dist.*, No. 21-1702, 2023 WL 6276698,

at *12 n.65 (M.D. Pa. Sept. 26, 2023) (same), Roman's response helps to provide a framework to

his allegations.  The Court understands Roman to allege, pursuant to 42 U.S.C. § 1983, that all

Defendants:  (1) violated his Fourteenth Amendment rights when they were deliberately

indifferent to his serious medical needs and (2) violated his First Amendment rights when they

retaliated against him for filing grievances, submitting informal complaints, and pursuing

litigation.  (Doc. Nos. 2, 19.)[8]  Roman also presents claims against all Defendants under the

ADA and Section 504 for his exclusion from the prison's MAT program.  (Doc. Nos. 2, 19.)

The County Defendants move to dismiss these claims[9] and request that Roman "be

---

[8] Roman also seems to claim that his Fourteenth Amendment procedural due process rights were violated when the County Defendants filed false disciplinary charges against him in October 2023 and when they refused to let him call witnesses during the disciplinary hearing and failed to give written notice of the board's factual conclusions and the evidence upon which it relied.  (Doc. No. 19 at 17–19.) *See Singleton v. Superintendent Camp Hill SCI*, 747 F. App'x 89, 92 (3d Cir. 2018) ("'[T]he imposition of disciplinary segregation for violation of prison rules and regulations cannot be imposed without providing [a pretrial detainee with] the due process protections set forth in *Wolff v. McDonnell*,'" including the "right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence." (quoting *Bistrian v. Levi*, 696 F.3d 352, 375 (3d Cir. 2012)); *see also Quiero v. Ott*, 799 F. App'x 144, 146 n.6 (3d Cir. 2020); *Stevenson v. Carroll*, 495 F.3d 62, 70 (3d Cir. 2007).  Defendants have not moved to dismiss this claim, so the Court does not address it further in this Memorandum.

[9] In addition to challenging the sufficiency of Roman's federal constitutional and statutory claims, the County Defendants also argue that Roman's state law claims should be dismissed.  (*See* Doc. No. 51-1 at 15–18.)  This argument is based on page 9 of Roman's initial Complaint, which includes the heading, "State Tort Claim Under State Constitution" and references an "intentional conspiracy[ ] and intentional infliction of emotional distress by form of punishment violating Due Process."  (*See* Doc. No. 2 at 9.) Even with a thorough and liberal reading of the Complaint, however, the Court does not understand

barred from future filings as his claims are both frivolous and duplicative to current ongoing suits previously filed" by him, i.e., the April Action. (Doc. No. 51-1 at 2, 18–19.) The Medical Defendants likewise move for dismissal of Roman's claims. (*See* Doc. No. 52.) The Court begins with Plaintiffs' constitutional claims under § 1983 before turning to his discrimination claims under the ADA and Section 504.

### A.    Section 1983 Claims

Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  "[T]o state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law." *Jenkins v. Cordova*, Civ. No. 22-6482 (KM) (CLW), 2023 U.S. Dist. LEXIS 84428, *9 (D.N.J. May 15, 2023) (citing *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011)).

"In evaluating a § 1983 claim, courts must 'identify the exact contours of the underlying

---

Roman to allege any state law claims.  Passing references to various legal precepts are not sufficient to raise claims under such principles. *See Campbell v. LVNV Finding, LLC & Resurgent Capital Servs.*, No. 21-5388, 2022 WL 6172286, at *7 (E.D. Pa. Oct. 7, 2022) (A "'passing reference' to jurisprudential precepts without more does not bring that issue before the Court in that it provides no basis for a ruling one way or the other.") (citing *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)); *Alexis v. Sessions*, No. 18-2099, 2018 WL 5077899, at *2 n.1 (D.N.J. Oct. 18, 2018).  Additionally, "Pennsylvania does not have a statutory equivalent to § 1983 and does not recognize a private right of action for damages stemming from alleged violation of the state constitution." *Miles v. Zech*, 788 F. App'x 164, 167 (3d Cir. 2019); *see also Plouffe v. Cevallos*, 777 F. App'x 594, 601 (3d Cir. 2019) ("[N]or is there a private right of action for damages under the Pennsylvania Constitution"); *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011) ("No Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution.").

right said to have been violated' and 'determine whether the plaintiff has alleged a deprivation of a constitutional right at all.'"  *Moore v. Luffey*, 767 F. App'x 335, 339 (3d Cir. 2019) (quoting *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015)).  When a § 1983 claim is brought against an individual defendant, the court must "next determine whether the plaintiff has demonstrated the 'defendant's personal involvement in the alleged wrongs.'"  *Id.* (quoting *Chavarriaga*, 806 F.3d at 222).  When the claim is brought against a local government or municipality, however, the court cannot hold the municipality liable on "a vicarious liability theory rooted in *respondeat superior*."  *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that local governments and municipalities are also considered persons under § 1983).  Instead, local governments and municipalities may be sued directly under § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.

Here, Defendants argue that Roman's § 1983 claims fail because he has not adequately alleged that he suffered constitutional violations or that any such violation is attributable to the County or PrimeCare under *Monell*.[10]  The Court addresses each issue in turn.

### 1.    Constitutional Violations

Roman alleges that Defendants violated his Fourteenth Amendment rights when they denied him access to necessary medical care and violated his First Amendment rights when they

---

[10] Neither motion argues for dismissal of the § 1983 claims against the individual Defendants on the grounds a particular defendant lacked "personal involvement" in the alleged constitutional wrong. Accordingly, the Court does not address that issue further and considers only whether dismissal of the § 1983 claims against the individual Defendants is appropriate because Roman failed to allege a constitutional violation.

retaliated against him for grieving and litigating perceived problems at CCP.

> a.   *Fourteenth Amendment Claim for Deliberate Indifference to Serious Medical Needs*

First, Roman brings Fourteenth Amendment claims for deliberate indifference to medical needs, which are primarily based on the denial of his participation in the prison's MAT program and the prison's failure to provide him with a bottom bunk despite his documented need for one. (*See, e.g.*, Doc. No. 2 at 15–22 and Doc. No. 19 at 6–9.)[11]

> i.   <u>Legal Standard</u>

Because Roman is a pretrial detainee, his medical treatment claims are governed by the Fourteenth Amendment's Due Process Clause, which "protects pretrial detainees from 'any and all punishment,'" not the Eighth Amendment's proscription against cruel and unusual punishment. *Happel v. Bishop*, 1:23-CV-13-SPB-RAL, 2024 WL 1508561, at *10 (W.D. Pa. Feb. 22, 2024) (quoting *Montgomery v. Aparatis Dist. Co.*, 607 F. App'x 184, 187 (3d Cir. 2015)); *see also Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005) (recognizing "distinction between pretrial detainees' protection from 'punishment' under the Fourteenth Amendment, on the one hand, and convicted inmates' protection from punishment that is 'cruel and unusual' under the Eighth Amendment, on the other"); *Montgomery v. Ray*, 145 F. App'x 738, 740 (3d Cir. 2005) ("While the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner, the proper standard for examining such claims is the standard set forth in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); i.e., whether the conditions of confinement (or here, inadequate medical

---

[11] Roman also appears to bring a Fourteenth Amendment claim premised on the cancellation of his mental health appointments for lack of a security escort. (*See, e.g.*, Doc. No. 2 at 20; Doc. No. 19 at 13.)  However, because neither the County Defendants nor the Medical Defendants have addressed this claim or moved for its dismissal, the Court does not address it further at this time.

treatment) amounted to punishment prior to an adjudication of guilt." (cleaned up)).  Although the two standards are not identical, the Eighth Amendment analysis informs the Fourteenth Amendment analysis, serving "as a floor for due process inquiries into medical and non-medical conditions of pretrial detainees."  *Montgomery*, 145 F. App'x at 740 (citing *Hubbard*, 399 F.3d at 165–67).  "To state a claim under the Eighth Amendment, an inmate must allege:  (1) a serious medical need; and (2) behavior on the part of prison officials constituting deliberate indifference to that need."  *Happel*, 2024 WL 1508561, at *10 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Under the first prong, a "medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks omitted); *cf. Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991) (explaining that a serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering").  This is an objective standard.  *See Moore*, 767 F. App'x at 340.

Under the second prong, an official acts with "deliberate indifference" when the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (2017) (deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed" (internal citations and quotation marks omitted)).  This is a subjective inquiry.  *See Moore*, 767 F. App'x at 340.  Not every

complaint of inadequate prison medical care rises to the level of deliberate indifference. *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023). Allegations of medical malpractice, negligence, and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Hayes v. Gilmore*, 802 F. App'x 84, 88 (3d Cir. 2020). For that reason, when "a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)). Nonetheless, "prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier or less efficacious treatment' of the inmate's condition." *Id.* at 228 (quoting *West v. Keve*, 571 F.3d 158, 162 (3d Cir. 1978)).

## ii. The MAT Program

The Court begins with Roman's claim that Defendants were deliberately indifferent to his serious medical needs when they refused to let him participate in CCP's MAT program. Neither the County Defendants nor the Medical Defendants explicitly dispute that opioid use disorder is a serious medical need. Nor can they. *See, e.g.*, *Strickland v. Delaware County*, No. 21-4141, 2022 WL 1157485, at *4 (E.D. Pa. Apr. 19, 2022) (recognizing opioid use disorder as a serious medical need); *Happel*, 2024 WL 1508561, at *10 (same). But they do seem to challenge whether Roman required treatment for this disorder while at CCP, stating, with no discussion, that Roman had "presumably . . . been clean and sober for over a year before the program was in existence" at the prison because he was incarcerated in the months leading up to its commencement. (Doc. No. 52-1 at 8–9; *cf.* Doc. No. 51-1 at 12 (asserting that "any substance use disorder would be addressed should Plaintiff be released from incarceration").) Contrary to

Defendants' assertion, however, Roman alleges that he continues to experience extreme cravings despite not having taken drugs during his incarceration, such that he requires treatment *now* and not merely if or when he is released.  (Doc. No. 2 at 34.)  He also claims that his medical records—which Defendants refuse to review—would support his assertion that he suffers from opioid use disorder and requires continuous treatment.  (*Id.* at 16, 25.)  Finally, although Roman does not claim that he has taken illicit substances while incarcerated, he has alleged that those substances were available at CCP, citing the fact that a correctional officer was fired from CCP in October 2023 for selling drugs, including buprenorphine, to inmates.  (*Id.* at 26.)  Taking these allegations as true, the Court finds that Roman has alleged a serious medical need.

Roman has also alleged that Defendants were deliberately indifferent to that need because they have "intentionally den[ied] . . . access to medical care" for his opioid use disorder and ongoing withdrawal symptoms.  *Pearson*, 850 F.3d at 534 (providing that deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed" (internal citations and quotation marks omitted)); *see also, e.g.*, *Happel*, 2024 WL 1508561, at *10 (explaining that the deliberate indifference "standard is satisfied by, among other things, an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, . . . or persistent conduct in the face of resultant pain and risk of permanent injury." (citing *Durmer*, 991 F.2d at 68 and *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990))).  Indeed, the County Defendants acknowledge that "Plaintiff desires to be in the MAT program but it was explained to him by a medical professional *that it was not an option*" despite the fact that the program is available for other inmates.  (Doc. No. 51-1 at 12 (emphasis added).)

The Medical Defendants, citing the Third Circuit's 1978 opinion in *Norris v. Frame*, argue that Roman does not have a constitutional right to MAT or the medications dispensed in connection with an MAT program, and therefore, they could not have been deliberately indifferent when they denied him access to that program.  (Doc. No. 52-1 at 8–9.)  But this misunderstands the deliberate indifference inquiry, which considers not whether the prisoner has an inherent right to a specific medication, but instead, "whether the[ officials'] refusal to allow [a pretrial detainee] access to a prescribed course of treatment constitutes a restriction that is inherent in confinement and the needs of orderly prison administration or whether it is an additional restriction, unrelated to guaranteeing [the plaintiff's] presence at his trial or security at the institution."  585 F.2d 1183, 1189 (3d Cir. 1979).  Although the court in *Norris* did state that "[t]here is no constitutional right to methadone and the County is under no duty to provide it," the court ultimately held that the prisoner plaintiff "properly assert[ed] a deprivation of a liberty interest" where the prison terminated his prescribed[12] methadone treatment without "demonstrating a legitimate interest [for] doing so."  *Id.* at 1188–89.

At this stage, Roman has alleged that Defendants knew he suffered from opioid use disorder, that they refused to let him participate in the MAT program or provide any other form of accepted treatment for that disorder despite the program's availability, and that this refusal caused Roman mental and physical pain and suffering.  That is enough for Roman's claim to proceed to discovery.  *Cf. Strickland*, 2022 WL 1157485, at *4 (denying motion to dismiss where the plaintiff alleged that he informed medical staff that he had been prescribed a common and medically accepted treatment for opioid use disorder, that he was denied that treatment

---

[12] In *Norris*, the pretrial detainee had been prescribed this treatment at the time of the deprivation. *See* 585 F.2d at 1185.  At this stage, it is unclear whether Roman had been similarly prescribed some form of treatment for his opioid use disorder.

pursuant to an official policy that made it available only to pregnant inmates, and that the forced withdrawal that he was subjected to caused him substantial pain and suffering); *see also Happel*, 2024 WL 1508561, at *10 ("Happel alleges that he informed [the defendant] of his OUD diagnosis and Subutex [buprenorphine] prescription and was told that he would not get his medication or any taper. . . .  These allegations are more than sufficient, at this stage in the proceedings, to plausibly allege that [the defendant] completely denied him access to necessary medical care.").

iii.   <u>A Bottom Bunk</u>

Next, the Medical Defendants[13] argue that Roman's claim regarding access to a bottom bunk fails because Roman has been given a bottom bunk at times and used a mattress on the floor at times, such that he has never been required to use the top bunk.  (Doc. No. 52-1 at 9.)  In other words, "efforts were made to accommodate [Roman] within the confines of only so many bottom bunks can be available in the prison."  (*Id*.)  But there is nothing in the Complaint to suggest that Roman was made to sleep on the floor because CCP lacked sufficient bottom bunk space.  Indeed, there is nothing in the Complaint about the availability of bottom bunks at CCP.

Focusing on the allegations in the Complaint, and taking those allegations as true, Roman has a serious medical need (osteogenesis imperfecta) and has been prescribed a bottom bunk in connection with that disorder.  (Doc. No. 2 at 34–35, 40.)  Despite being told by Roman and CCP's medical staff that he requires a bottom bunk, CCP employees have, without reason, refused to provide him with one on a consistent basis.  (*Id.* at 35.)  Roman has also alleged that placing his mattress on the floor is not an adequate accommodation because it is contrary to the

---

[13] The County Defendants do not address Roman's claim for deliberate indifference to serious medical needs based on his bottom bunk status.  Therefore the claim will proceed to discovery as to these Defendants.

medical staff's instructions, contrary to prison policy, and causes severe pain to Roman's back
and knees.  (*Id.* at 35, 40.)  Taking Roman's allegations as true, the Court will permit Roman to
proceed to discovery on this claim.  *See e.g., Hanna v. Lehigh Cnty. Dep't of Corr.*, No. 22-4305,
2024 WL 1259269, at *6 (E.D. Pa. Mar. 25, 2024) (permitting deliberate indifference claim
based on failure to provide bottom bunk to proceed to discovery); *Saunders v. GEO Grp., Inc.*,
CIVIL ACTION NO. 19-CV-2322, 2019 WL 5558659, at *4 (E.D. Pa. Oct. 25, 2019)
("Construing Mr. Saunders's allegations liberally and accepting the facts as true, Mr. Saunders
has set forth a plausible claim for relief against Officer Kenneth for denying him a bottom
bunk—which was medically ordered as a result of his treatment for a concussion—for a non-
medical reason (i.e., another prisoner was already assigned to the bottom bunk of that cell).").

*        *        *

Roman has adequately alleged Fourteenth Amendment violations based on Defendants'
refusal to let him participate in the prison's MAT program (or provide alternative treatment for
his opioid use disorder) and failure to consistently provide him with access to a bottom bunk.

### b.        First Amendment Claim for Retaliation

Roman also alleges that Defendants violated his First Amendment rights when they
retaliated against him for participating in the prison grievance process, for complaining about
CCP to various state agencies, and for filing the April Action and this litigation.

### i.        Legal Standard

To state a plausible First Amendment retaliation claim, a prisoner must allege:  (1) he
engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to
deter a person of ordinary firmness from exercising his constitutional rights; and (3) the
constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.
*Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *Coit v. Garman*, 812 F. App'x 83, 86 (3d Cir.

2020).  Under the first prong, a prisoner's filing of a grievance or lawsuit constitutes

constitutionally protected conduct.  *See Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016);

*Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003).  Under the second prong, "[a]n adverse

consequence 'need not be great in order to be actionable[;]' rather, it need only be 'more than *de*

*minimis*.'"  *Watson*, 834 F.3d at 423 (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006))

(alterations in original).  Finally, under the third prong, "[t]o establish the requisite causal

connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity

between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism

coupled with timing to establish a causal link."  *Ruttle v. Brady*, No. 22-3000, 2023 WL

5554648, at *2 (3d Cir. Aug. 29, 2023) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480

F.3d 259, 267 (3d Cir. 2007)).

ii.   <u>Analysis</u>

The Medical Defendants argue that Roman's First Amendment claim fails because he has

not alleged "how his First Amendment rights have been violated."  (Doc. No. 52-1 at 5.)  They

assert that "it is clear that Plaintiff has continued to file sick call slips, grievances, and multiple

lawsuits . . . [t]hus, he certainly has been able to exercise his right to complain and to seek

redress with the Court."  (*Id.*)  This argument misunderstands Roman's First Amendment claim.

He does not argue that Defendants *interfered* with his ability to file complaints, grievances, and

lawsuits in violation of the First Amendment, but instead, claims Defendants *retaliated* against

him for exercising his First Amendment rights.  *See, e.g.*, *B.L. v. Zong*, Civil No. 3:15-CV-1327,

2016 WL 11269933, at *10 (M.D. Pa. Aug. 30, 2016) (discussing difference between First

Amendment retaliation claim and First Amendment interference claim).  Accordingly, the

Medical Defendants' argument fails.

The County Defendants appropriately focus on the test for a First Amendment retaliation

claim, arguing that Roman has failed to satisfy the first and second elements of that claim.  First, they assert that Roman has failed to show that he engaged in constitutionally protected activity because the prison's "grievance process is not a constitutionally protected right," nor does an inmate have the right to "determin[e] where he chooses to eat," to maintain an "assignment as a tier worker," or to "parad[e] around the recreation yard as if he was 'picketing.'"  (Doc. No. 51-1 at 8.)  The County Defendants are correct that claims based on the handling of prison grievances fail because "prisoners do not have a constitutional right to prison grievance procedures." *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)).  In other words, allegations predicated on failures of the grievance process or improper handling of or response to grievances do not give rise to a constitutional claim.  *See Woods v. First Corr. Med. Inc.*, 446 F. App'x 400, 403 (3d Cir. 2011) ("We agree with the District Court that because a prisoner has no free-standing constitutional right to an effective grievance process, . . . Woods cannot maintain a constitutional claim against Lucas based upon his perception that she ignored and/or failed to properly investigate his grievances." (internal citation omitted)); *Burnside v. Moser*, 138 F. App'x 414, 416 (3d Cir. 2005) (explaining that "[i]nmates do not have a constitutionally protected right to the prison grievance process" and that "a state grievance procedure does not confer any substantive constitutional right upon prison inmates" (internal quotation marks and citations omitted)).  But Roman does not allege a constitutional violation based on the handling of his grievances.  Instead, he claims that his participation in that grievance process is a "protected activity" for purposes of a First Amendment retaliation claim.  As noted above, it is well established that a prisoner's filing of a grievance or lawsuit constitutes constitutionally protected conduct.  *Watson*, 834 F.3d at 422.  Thus, Roman has clearly alleged that he engaged

in protected activity.

Second, the County Defendants assert that Roman has not suffered any adverse action because of that protected conduct.  They note that prison officials require broad discretionary authority in the operation of a prison facility and should not be punished for citing an inmate after a confrontation and placing an inmate on suicide status when there are known stressors present.  (Doc. No. 51-1 at 8–9.)  Such arguments are best left for summary judgment.  At this stage of the proceedings, Roman need only allege that he suffered more than *de minimis* adverse actions because he filed grievances and lawsuits against prison officials.  Roman satisfies that standard.  Among other things, he alleges the loss of his tier-worker job, the issuance of allegedly false disciplinary citations, his placement in restrictive housing, and the denial of medical treatment.  *See, e.g.*, *Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) ("[B]eing placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." (quoting *McKee*, 436 F.3d at 170)); *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) ("In the prison context, we have held that the following actions were sufficient to establish adversity:  several months in disciplinary confinement; denial of parole, financial penalties, and transfer to an institution whose distance made regular family visits impossible; and placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs."); *Hagan v. Dolphin*, No. 13-2731, 2014 WL 5242377, at *7 (M.D. Pa. Oct. 15, 2014) (finding that plaintiff stated a claim for First Amendment retaliation against prison officials who deprived plaintiff of access to medication for a psychotic disorder and removed him from the active mental health roster in retaliation for filing grievances and litigation against prison staff).

Although the County Defendants do not discuss the third element of a retaliation claim

(causation), the Court finds it satisfied as well. Roman alleges that the adverse actions he suffered are causally connected to the filing of grievances and civil actions. Not only is there a temporal proximity between the protected activities and the various instances of retaliation, Roman has also alleged that multiple individual Defendants referenced his complaints, grievances, and lawsuits when acting against him, telling him that they will only stop if "he will." *See, e.g., Coit v. Marsh*, No. 22-1567, 2024 WL 1356682, at *11 (M.D. Pa. Mar. 29, 2024) (denying motion to dismiss First Amendment retaliation claim where plaintiff's complaint established that he engaged in constitutionally protected conduct when he filed a prior lawsuit against prison officials, that there was retaliatory motive because, less than one month later, plaintiff was instructed to withdraw that lawsuit or things would get worse, and one day after plaintiff was given that instruction, plaintiff was placed in an unsanitary cell with no mattress, blanket, or water, and was denied showers, clothes, and mental health treatment).

*     *     *

Roman has adequately alleged a First Amendment retaliation claim.

### 2.   <u>Municipal Liability</u>

Having found that Roman adequately alleged violations of his constitutional rights, the § 1983 claims may proceed against the individual Defendants.[14] As for the claims against the County and PrimeCare, however, the Court must determine whether the alleged constitutional violations can be attributed to the County and PrimeCare under *Monell*.

### a.   *Legal Standard*

As noted above, a municipality "may not be held liable for constitutional torts under

---

[14] As noted previously, the individuals Defendants moved to dismiss Roman's § 1983 claims only on the basis that Roman had failed to allege a constitutional violation.

§ 1983 on a vicarious liability theory rooted in *respondeat superior*." *Mulholland*, 706 F.3d at 237 (3d Cir. 2013); *see also Monell*, 436 U.S. at 690.  Similarly, "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of *respondeat superior* or vicarious liability.'" *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003)).

Instead, there are two ways for a § 1983 claim against a municipality or municipal contractor to proceed:  (1) "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries," or (2) "[a] plaintiff may put forth . . . that [their injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quotation marks and citations omitted); *see also Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs." (citations and quotation marks omitted)).

Under the first theory—policy or custom—"[p]olicy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Mulholland*, 706 F.3d at 237 (quotation marks omitted). And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." *Id.* (quotation marks omitted).  Under the second theory—failure or inadequacy—the plaintiff need not identify a municipal policy or custom, and instead, "has the separate, but equally

demanding requirement of demonstrating a failure or inadequacy amounting to deliberate indifference on the part of the municipality." *Forrest*, 930 F.3d at 106; *see also Carter v. City of Philadelphia*, 181 F.3d 339, 356–57 (3d Cir. 1999) ("Where, as here, the policy in question concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact.").  Under either theory, the plaintiff must tie the unconstitutional act to "the conscious decision or deliberate indifference" of the relevant policymaker, because absent such decision or indifference by "some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom, or a failure to train." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1063 (3d Cir. 1991).

*b.      Analysis*

The County and PrimeCare argue that Roman has failed to show municipal liability attaches in this case because there can be no *Monell* liability if there is no underlying constitutional violation.  (Doc. No. 51-1 at 13–15; Doc. No. 52-1 at 9–10.)  However, as discussed above, the Court will permit Roman's Fourteenth Amendment and First Amendment claims to move forward, so this argument is rejected.

The County further contends that Roman's *Monell* claim fails because he has made "nothing more the conclusory statements without any factual assertion of a specific policy or custom."  (Doc. No. 51-1 at 14.)  The Court disagrees.  Roman has identified multiple customs, policies, and inadequacies with specificity.  He alleges that the County and PrimeCare have a "custom or policy to provide (MAT) treatment" to inmates continuing treatment and categorically refuse to provide it to any inmate seeking "induction" into the program, even when such treatment is medically necessary.  (Doc. No. 2 at 32-33.)  He claims that Defendants have a

custom of "ignor[ing] medical requests [and ]delay[ing] medical treatments" because they lack security escorts. (*Id.* at 37.)  And he alleges "Defendants failed to adequately train, monitor, and supervise" their employees in the "proper procedures for dealing with inmates who have mental health conditions and disabilitys [sic]" requiring accommodations. (*Id.* at 39.)  Finally, he claims that the County and PrimeCare have adopted a custom of inaction when it comes to formal complaints being filed by prisoners, which has in turn, caused officers to feel comfortable retaliating against prisoners, like Roman, who complain about them.

The County does not address these allegations, and instead, focuses on Roman's allegation that "CCP has a policy and custom of understaffing and failure to train." (Doc. No. 51-1 at 14–15.)  The County correctly notes that general complaints of understaffing are insufficient to show a "custom" of misconduct attributable to the County. *See Brown v. Del. Cnty. Prison Bd. Of Inspectors*, 741 F. App'x 135, 138 (3d Cir. 2018) ("Brown's vague and conclusory allegation that the defendants had a policy or custom of 'fail[ing] to provide an adequate level of security staffing,' is insufficient to state a claim").  But, as noted above, that is not the only policy, custom, or failure identified by Roman.

Considering Roman's allegations as a whole and construing them liberally, the Court finds that Roman has sufficiently pled municipal customs, policies, and inadequacies that are causally related to his alleged constitutional deprivations. *See, e.g., Richardson v. Clark*, No. 22-0029, 2024 WL 1258653, at *6 (M.D. Pa. Mar. 25, 2024) (denying motion to dismiss where the plaintiff claimed PrimeCare had a custom of "delaying or refusing inmates medical treatment until the inmates are extremely ill, or dead, to save money" and alleged that one of the individual defendants stated, "'you have to be on your death bed for Prime Care to send you' to the hospital"); *Cyr v. Schuylkill County*, No. 22-0453, 2023 WL 1107879, at *5 (M.D. Pa. Jan. 30,

2023) (denying motion to dismiss *Monell* claim against PrimeCare where the plaintiff identified several policies, customs, and practices which allegedly violated the deceased prisoner's constitutional rights, including a failure to have any policy "concerning inmates and substance abuse disorders or inmates suffering from withdrawal symptoms"); *cf. Kinney v. County of Berks*, No. 22-2566, 2023 WL 3868379, at *12–14 (E.D. Pa. June 6, 2023) (finding the prisoner plaintiff's "inability to allege a *specific* policy or custom does not sink his claim" because his "allegations about his entry to prison and multitude of risk factors—combined with PrimeCare Medical's idleness—are enough to plausibly allege an inadequate policy, custom or existing practice." From those allegations, the court found "[i]t is plausible that PrimeCare Medical ignored a deficient practice of waiting to treat inmates with known suicide risk factors until several days after they arrive").

*     *     *

Defendants' motions to dismiss are denied with respect to Roman's § 1983 claims.

### B.     ADA and Section 504 Claims

In addition to his constitutional claims under § 1983, Roman also raises claims under Title II of the ADA and Section 504 of the Rehabilitation Act based on his exclusion from participation in CCP's MAT program.

#### 1.     <u>Legal Standard</u>

"Both the ADA and [Section 504] require public entities, including state prisons, to provide, in all of their programs, services, and activities, a reasonable accommodation to individuals with disabilities." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 287 (3d Cir. 2019); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210–12 (1998) (noting the phrase "services, programs, or activities" in Title II of the ADA includes recreational, *medical*, educational, and vocational prison programs). "[W]hen a plaintiff sues under both [Section 504] and the ADA,

[courts] often address both claims in the same breath, construing the provisions of both statutes

in light of their close similarity of language and purpose," since "the scope of protection afforded

under both statutes, *i.e.*, the general prohibition against discrimination, is materially the same."

*Berardelli v. Allied Servs. Inst. Of Rehab. Med.*, 900 F.3d 104, 117 (3d Cir. 2018) (internal

quotation marks, citations, and alterations omitted).  To state a plausible claim under the ADA

and Section 504, a plaintiff "must allege that he is a qualified individual with a disability, who

was precluded from participating in a program, service, or activity, or otherwise was subject to

discrimination, by reason of his disability." *Furgess*, 933 F.3d at 288–89.  When a plaintiff

seeks compensatory damages, he "must also show intentional discrimination under a deliberate

indifference standard." *Id.* at 289 (footnote omitted).

### 2.   <u>Analysis</u>

The Court begins by determining which Defendants are properly sued under the ADA

and Section 504 before turning to whether Roman has plausibly alleged a violation of those

statutes.

#### a.   *Proper Defendant*

The proper defendant under a claim for violation of Title II of the ADA is the public

entity or an individual who controls or directs the functioning of the public entity.  *See Emerson

v. Thiel College*, 296 F.3d 184, 189 (3d Cir. 2002).  Title II of the ADA does not provide for

individual liability.  *See Kokinda v. Pa. Dep't of Corr.*, 779 F. App'x 938, 942 (3d Cir. 2019)

("Kokinda's claims for individual damages liability under Title II of the ADA fail for the simple

reason that there is no such liability."); *Bowens v. Wetzel*, 674 F. App'x 133, 136 (3d Cir. 2017)

("[T]he District Court could have properly followed the holdings of those circuits which have

concluded that there is no individual damages liability under Title II of the ADA, which provides

an additional basis to affirm the dismissal of this claim.").[15]  Similarly, the proper Defendant

under a Section 504 claim is the public entity receiving federal assistance.  *See A.W. v. Jersey*

*City Pub. Sch.*, 486 F.3d 791, 804 (3d Cir. 2007) (stating that "suits may be brought pursuant to

Section 504 against recipients of federal financial assistance, but not against individuals").

Accordingly, the Court considers Roman's ADA and Section 504 claims to be asserted only

against Chester County.[16]

        *b.*     *Violation by the County*

The County argues that it is not enough for Roman to allege that he was denied MAT

because an alleged failure to provide an inmate with adequate medical treatment does not state a

claim under the ADA or Section 504.  (Doc. No. 51-1 at 13 (citing *McCamey v. Wetzel*, Case No.

3:20-cv-183-SLH-KAP, 2021 WL 11695987 (E.D. Pa. Aug. 16, 2021); *Iseley v. Beard*, 200 F.

App'x 137, 142 (3d Cir. 2006).)  Instead, it claims Roman must show that he was denied access

to the prison's MAT program "by reason of [his] disability."  (*Id.*)  The County argues that

Roman has failed to satisfy this standard because he alleges that he was denied access to the

---

[15] A claim under Title II of the ADA for a past violation is cognizable against an individual defendant in his official capacity.  *See Holden v. Wetzel*, No. 18-237, 2021 WL 1090638, at *4 (W.D. Pa. Mar. 22, 2021) (noting that official capacity claims for past violations of the ADA are theoretically actionable).  Official capacity claims are indistinguishable from claims against the governmental entity that employs the Defendants.  *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)).  Thus, ADA claims against the individual County Defendants, here, employees of CCP, are really claims against their employer, Chester County, and thus, duplicative of the ADA claim asserted directly against the County.

[16] To the extent Roman also asserts these claims against PrimeCare, the Court grants the company's motion to dismiss the ADA and Section 504 claims against it because it is not a viable defendant.  *See Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 169 (3d Cir. 2015) (dismissing ADA and Section 504 claims against Corizon Health, Inc., a prison healthcare contractor, "because [it is] not [a] public entit[y] subject to suit under the ADA or the Rehabilitation Act"); *Keifer v. PrimeCare Med., Inc.*, CIVIL ACTION NO. 16-6620, 2017 WL 3142279, at *3 (E.D. Pa. July 24, 2017) (granting motion to dismiss ADA claim against PrimeCare because it is not "an instrumentality of the state or otherwise a public entity").

MAT program *despite* his alleged substance use disorder and not *because of* that disorder.  (*Id.*)
The Court disagrees.

Taking the allegations in the Complaint and the reasonable inferences they support in
Roman's favor as the Court must at this stage, Roman has alleged sufficient facts to proceed on
his statutory claims against Chester County.  Roman has alleged that he suffers from opioid use
disorder and has been intentionally excluded from participation in the MAT program or provided
an acceptable alternative treatment.  Mindful that Roman is a *pro se* litigant, those allegations are
sufficient at this stage of the litigation.  *See Strickland*, 2022 WL 1157485, at *3 (denying
motion to dismiss ADA and Section 504 claims where the plaintiff alleged that he had opioid use
disorder, that he was excluded from participation in a prison program that provided methadone
treatment, and that the prison "failed to undertake any individualized review of Strickland's
situation to determine whether he could be safely provided with his prescribed medical
treatment, provide Strickland with an adequate alternative treatment, or otherwise reasonably
accommodate Strickland's disability"); *id.* (finding allegations supported a finding of intentional
discrimination based on a disability, i.e., opioid use disorder, where the alleged "facts plausibly
suggest that Defendants were aware of the inadequacy of the OUD treatment provided" by the
prison but nevertheless "denied Plaintiff his prescribed treatment," i.e., methadone, "a denial
unlikely to occur were Strickland seeking a common prescribed treatment for asthma or
diabetes"); *Schiavone v. Luzerne County*, No. 21-1686, 2022 WL 3142615, at *8–9 (M.D. Pa.
Aug. 5, 2022) (denying motion to dismiss ADA and Section 504 claim against Luzerne County
where the plaintiff alleged that the County deprived her of medical services including access to
medication and that it failed to accommodate her needs during her withdrawal from opioids);
*McMillen v. Wetzel*, No. 20-192, 2021 WL 5088069, at *7 (W.D. Pa. Sept. 22, 2021) (denying

motion to dismiss ADA claim where the plaintiff pled that "he is a qualified individual with a disability based on his substance use disorder; he qualifies for the same treatment provided to [inmates] incarcerated after 2019; he was excluded from receiving these benefits as a result of the DOC's policy; and this resulted from his disability because Defendants have refused treatment for his disorder based on ignorance of the disorder"), *report and recommendation adopted*, No. 20-192, 2021 WL 5088023 (W.D. Pa. Nov. 2, 2021); *McKissick v. County of York*, No. 09-1840, 2010 WL 1930132, at *7 (M.D. Pa. Mar. 19, 2010) (allowing ADA claim to proceed where the inmate alleged that he was denied prescribed methadone treatment even after he directly brought his condition and care needs to the defendants' attention), *report and recommendation adopted*, No. 09-1840, 2010 WL 1930144 (M.D. Pa. May 13, 2010).

*     *     *

The Medical Defendants' motion to dismiss is granted as to Roman's ADA and Section 504 claims. The County Defendants' motion to dismiss is granted as to Roman's ADA and Section 504 claims asserted against the individual Defendants, but it is denied to the extent Roman asserts those claims against the County.

## IV.    CONCLUSION

For the reasons discussed above, the County Defendants' motion to dismiss is granted only as to Roman's ADA and Section 504 claims asserted against the individual Defendants; otherwise, the motion is denied.[17]  The Medical Defendants' motion to dismiss is also granted as to Roman's ADA and Section 504 claims and denied in all other respects.  An appropriate order follows.

---

[17] For this reason, the Court also denies the County's request that Roman be barred from filing future actions.